UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ANTHONY AVOLA, *et al.*,

                    Plaintiffs,

          -against-

LOUISIANA-PACIFIC CORPORATION, *et al.*,

                    Defendants.

----------------------------------------------------------------x

**MEMORANDUM & ORDER**

11-CV-4053 (PKC)

PAMELA K. CHEN, United States District Judge:

      This action is about an advertisement that reads: "LP SmartSide products work and cut just like traditional wood, taking nails and screws with ease." (Dkt. No. 23 ("Defs. Ex."), Ex. G.) Defendants Louisiana-Pacific Corporation ("Louisiana-Pacific") and Home Depot U.S.A., Inc. ("Home Depot") seek summary judgment, dismissing Plaintiffs' breach of express warranty and false advertising claims based on this advertisement ("Motion"). (Dkt. No. 22.) The Motion is GRANTED in part and DENIED in part, for the reasons set forth below.

    I.    <u>Background</u>

        *A.  Avola's Carpentry Experience*

      Plaintiff Anthony Avola ("Avola"), a carpenter's son and self-described "master carpenter," has had over three decades of experience in the carpentry industry.[1] (Defs. 56.1 ¶¶ 2-

---

[1]     For purposes of the Motion, the facts are construed in the light most favorable to Plaintiffs. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970) (Harlan, J.). Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires (i) the party moving for summary judgment (the "moving party") to submit, using numbered paragraphs, a statement of the alleged facts on which

6; Defs. Ex. A ("Avola Dep."), at 12, 82-83.)  Avola was also a member of the local carpenters'

union for more than two decades.  (Defs. 56.1 ¶ 3.)

Avola's industry experience involved working with different types of wood.  (Pls. 56.1,

at 3 ¶ 12.)  At his deposition, Avola stated, based on this experience, that one would only use

"soft woods" in construction, for which "you hit the nail once and then you take your finger

away and you hammer the rest of it in."  (Avola Dep., at 89-90.)  Avola added:

> [I]n my kind of carpentry—I wasn't a cabinet maker.  A cabinet maker uses hard
> woods. . . . [W]e never drilled in any type of wood because the nail goes through the
> wood with no problem and that's what I was used to.

(*Id.* at 91.)  While recognizing the risk that nails would ricochet, Avola also stated that he never

encountered such risk when nailing into "soft woods"; if anything, the nails "fall[] lightly" away,

rather than ricocheting.  (Pls. 56.1, at 3 ¶ 14.)

### B.  *Avola's Employment at Home Depot*

In early-to-mid 2000, around the age of 70, Avola took a part-time job as a sales associate

at the Home Depot store in Commack, New York (the "Home Depot Store" or the "Store").

(Defs. 56.1 ¶ 8; Avola Dep., at 8, 26.)  In spite of his extensive experience in carpentry, Avola

was assigned to work in the Store's plumbing department. (Avola Dep., at 74-75.)   Avola

---

it relies (*see* Dkt. No. 24 ("Defs. 56.1")); and (ii) the non-moving party to submit a statement
(a) responding, in correspondingly numbered paragraphs, by admitting or denying the alleged
facts in each paragraph of the moving party's statement and (b) alleging, in additional numbered
paragraphs, other facts (*see* Dkt. No. 28 ("Pls. 56.1")).  Local Rule 56.1(a)-(b).

If the moving or non-moving party denies an alleged fact in the opposing party's
statement but fails to support this denial with citations to admissible evidence, such fact shall be
deemed admitted for purposes of the Motion.  Local Rule 56.1(d); *see, e.g.*, *Nat'l Econ. Research
Assocs., Inc. v. Purolite 'C' Corp.*, No. 08 Civ. 7600, 2011 WL 856267, at *1 n.2 (S.D.N.Y.
Mar. 10, 2011) ("[C]itations to the parties' Rule 56.1 statements concern factual assertions that
are admitted or are deemed admitted because they were neither admitted nor denied by the
opposing party or have not been contradicted by citations to admissible evidence.").   Any
citation herein to only one of the party's statements, without indication that an alleged fact is
disputed, means that this Court has deemed such fact admitted.

admitted that he only "knew enough about plumbing to tell [the customers] what they needed," from having observed the plumbers at one of his prior jobs.  (*Id.* at 75-76.)

Like Avola, other employees of the Store were also assigned to work in departments for which they had little-to-no prior experience.  Michael Phillips was only experienced with plumbing and heating, but had worked in the electrical department and on the contractors' desk before moving to the plumbing department.  (Defs. Ex. C ("Phillips Dep."), at 7-8.)  Evelyn Pretty likewise worked in the paint, hardware, and lumber departments and on the contractors' desk, even though her background was in floral design and not construction.  (Defs. Ex. B ("Pretty Dep."), at 6-10.)  Pretty denied that the Store required its employees to have any experience in home improvement or construction, much less required those in the lumber department to have experience with lumber.  (*Id.* at 25-26.)  As a matter of fact, Phillips insisted that the Store expected its employees to "work every department," regardless of the department to which they were assigned.  (Phillips Dep., at 22.)

In terms of the information that the Store's employees were required to possess regarding the products sold, Pretty stated that Home Depot offered different department-specific classes, such as a "*very basic* class on all the materials in the department" and classes "sponsored by a vendor." (Pretty Dep., at 7-8, 17 (emphasis added).)  Specifically, having worked for three years in the lumber department, Pretty also stated that "I'm sure at one point in a class [LP SmartSide] was gone over," though she denied ever having read materials regarding, or practiced using, this product.  (*Id.* at 8-9, 12-13, 17-19.)  Pretty stated that, as such, the employees could only "answer with a *basic* knowledge of the products" in their departments.  (*Id.* at 7 (emphasis added); *see also id.* at 29 ("If [the customers] are looking for a particular product[,] [the sales

associates] will show them the types of products that are available, but they don't have the knowledge.").)

### C. Avola's Purchase of LP SmartSide

Home Depot sells siding products to cover the outside of buildings and other structures. Among these products is LP SmartSide, a type of "composite wood" siding product created by combining wood byproducts and chemicals. (Defs. 56.1 ¶ 18; Pretty Dep., at 14.) On its website, Louisiana-Pacific advertises LP SmartSide, touting, in relevant part, that "LP SmartSide products work and cut just like traditional wood, taking nails and screws with ease" (the "Advertisement"). (Defs. Ex. G.)

According to Pretty, Home Depot also sells other types of siding products, such as "vinyl" and actual "wood." (Pretty Dep., at 15-17.) Information from Home Depot's website, which Plaintiffs introduce into evidence, indicates that the actual "wood" siding products include mostly products made from white cedar and T1-11 Siding, a product made from longleaf pine.[2] (Pls. Ex. B; *see also* Pretty Dep., at 17 (testifying that "T1[-]11 is all wood").) The product page for T1-11 Siding specifically describes this product as plywood with a "traditional wood siding

---

[2]    Defendants object to Plaintiffs' allegations that siding products made from white cedar and longleaf pine have densities of 19.67 to 21.98 pounds per cubic foot and 39.83 pounds per cubic foot, respectively, as compared with LP SmartSide's specified density of 28 to 70 pounds per cubic foot. (Dkt. No. 27 ("Defs. Reply 56.1") ¶¶ 12-13; Defs. Ex. F.) To support these allegations, Plaintiffs cite to a California State University website entitled "Physical Properties of Common Woods." (Dkt. No. 30 ("Pls. Ex."), Ex. C.) By citing to this website, Plaintiffs expect this Court to take judicial notice of the seemingly higher density of LP SmartSide as compared to actual "wood" siding products. This Court, however, cannot do so. The scientific facts on this website are not judicially noticeable, in that this Court cannot ascertain who created this website and how that person obtained the scientific facts contained therein. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is *not subject to reasonable dispute* because it[] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (emphasis added)).

*look*." (Pls. Ex. B (emphasis added).) Plywood is created by layering thin strips of actual wood.[3] (Avola Dep., at 132.)

On the afternoon of October 1, 2009, Avola went to the Home Depot Store, where he was still employed, to buy a siding product for the extension to the shed in his backyard. (Defs. 56.1 ¶¶ 26-27; Defs. Ex. E; Avola Dep., at 130-31; Pretty Dep., at 20.) According to Avola, he had previously used T1-11 Siding for the shed. (Avola Dep., at 132, 139.) This time, Avola had also purchased T1-11 Siding, and was about to leave the Store when an unnamed, Home Depot sales associate[4] in the lumber department approached him. (Pls. 56.1, at 12 ¶ 2; Avola Dep., at 33, 131.) The sales associate suggested that Avola try LP SmartSide, as an alternative, stating that it "nails just like wood," "works as easy as traditional wood siding," and can be installed the same way as T1-11 Siding (the "Related Statements").[5] (Pls. 56.1, at 12 ¶¶ 3-4; Avola Dep., at 33-34.) According to Avola, this was the first time that he had heard about LP SmartSide.[6] (Avola Dep., at 34.) Avola subsequently purchased LP SmartSide. (Defs. 56.1 ¶ 26.)

---

[3] The fact that T1-11 Siding, which is still made from actual wood, looks like but does not qualify as a "traditional wood" siding product suggests that "traditional wood" siding products are a *sub*-category of actual "wood" siding products.

[4] Avola stated that he remembered the Home Depot sales associate's face, but not his name. Avola described the sales associate as an "elderly guy, white hair, taller than me." (Avola Dep., at 33, 35.) Avola explained that he only knew the names of the sales associates in the plumbing department where he worked. (*Id.* at 26.)

[5] Defendants object to the allegations about Avola's conversation with the Home Depot sales associate as "inadmissible hearsay." Testimony from Avola's affidavit and deposition, however, may be considered on summary judgment, so long as such testimony would be admissible at trial. *See infra* at Section III.C.2.i.

[6] Avola did not visit Louisiana-Pacific's website, nor view the actual Advertisement for LP SmartSide, until after the accident, when he was researching this product. (Defs. 56.1 ¶¶ 42-44; Avola Dep., at 35-39, 146-49, 232.)

### D.  Avola's Accident

On the morning of November 3, 2009, Avola started installing LP SmartSide on the extension to the shed.  (Defs. 56.1 ¶¶ 29-30.)  For nailing into this "composite wood" siding product (*id.* ¶ 18), Avola adhered to the same procedures that he had previously followed for "wood" siding products.  (Pls. Ex. A ¶ 7.)  Avola proceeded to hammer two to three nails per side into every panel of LP SmartSide, in order to keep the panels in place.  (Pls. 56.1, at 6 ¶ 34; Avola Dep., at 178.)  Although LP SmartSide's installation instructions—which Avola neither received when he purchased this product, nor saw until after the accident—required at least the use of "sixpenny" (*i.e.*, two-inch) nails, Avola used "fourpenny" (*i.e.*, one-and-a-half-inch) nails. (Defs. 56.1 ¶¶ 25, 31, 43; Avola Dep., at 44, 47, 144-45.)  Avola averred that, under the carpenters' union's rules, use of the shorter nails was still proper, given the thickness of the panels.  (Defs. 56.1 ¶ 32.)

Avola began nailing in the panels of LP SmartSide from the back to the front of the shed. (Avola Dep., at 170.)  According to Avola, even in the beginning, the nails refused to stay in place after he hammered them once;[7] he had to hammer each nail two or three times for it to hold, before letting go with his left hand and fully hammering in the rest of the nail.  (*Id.* at 180-81.)  Avola also stated that, in some places, the nails "fell to the floor," and elsewhere "it was hard to nail, so I would skip the area and go to a different area to nail."  (*Id.* at 180-82; *see also id.* at 190 (testifying that "I tried to nail it in one spot and then I had to change the place of the nail because it became—after two or three times, it wouldn't even hold in place anymore").)

---

[7]      Defendants allege that Avola was using a nail gun, as opposed to a hammer, based on Phillips's deposition testimony that Avola told him so several weeks after the accident. (Defs. 56.1 ¶¶ 57, 59-60.)  Plaintiffs, however, allege that Phillips and other employees *thought* that the accident had occurred with a nail gun, but that Avola advised them that he had used a hammer.  (Pls. 56.1, at 10-11 ¶¶ 59-60.)

By mid-afternoon, Avola had hammered about 100 nails into seven panels of LP SmartSide. (Defs. 56.1 ¶ 35; Avola Dep., at 178-79, 182-84.) Shortly thereafter, as he was nailing in the eighth and last panel, Avola stooped down slightly, tapped one of the nails into place, let go of it, and hammered it again once or twice, at which point it ricocheted into his left eye. (Defs. 56.1 ¶¶ 37-38.) Avola recounted that the nail "felt like a bullet hit my eye" and that, after the accident, he felt as if he was "looking through . . . a bottle of Vasoline." (Avola Dep., at 170, 188.)

Avola stated that, six months after the accident, upon his recovery, he finished nailing in the eighth panel of LP SmartSide using the same type of nails, except that this time he *pre-drilled* the nails into the panel. (*Id.* at 198.)

II.    <u>Procedural History</u>

On July 5, 2011, Plaintiffs commenced this action in New York State court. (Dkt. No. 1.) Plaintiffs' Complaint, construed liberally insofar as it combines several claims under single causes of action, asserts the following claims: design and manufacturing defects, failure to warn, negligence, breaches of express and implied warranties, false advertising, and loss of consortium. (Dkt. No. 1-1 ("Compl.") ¶¶ 14-34.)

On August 23, 2011, Defendants removed this action to this District, based on diversity jurisdiction. (Dkt. No. 1.) Magistrate Judge E. Thomas Boyle directed the parties to complete any fact and expert discovery by February 1, 2013 and June 15, 2013, respectively. (Dkt. No. 14.)

On April 18, 2013, this action, originally assigned to Judge Denis R. Hurley, was reassigned to this Court. (Docket Entry, dated Apr. 18, 2013.) On May 16, 2013, at a pre-motion conference, the parties agreed to waive any expert discovery in this action, and proceed with briefing the Motion presently before this Court. (Minute Entry, dated May 16, 2013.)

III.  <u>Discussion</u>

    *A.  Standard of Review*

Federal Rule of Civil Procedure 56 provides for summary judgment on a claim, where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The initial burden belongs to the moving party.  *Adickes*, 398 U.S. at 159-60.  The moving party satisfies the initial burden by showing an absence of any factual issues that would allow a "reasonable jury" to find for the non-moving party on that claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (White, J.).

If the moving party makes such a showing regarding an "essential element of the nonmoving party's case," all other facts are "necessarily render[ed] . . . immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (Rehnquist, J.); *see also Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992) ("If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment.").  The burden then shifts to the non-moving party, who "must show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial."  *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994).

Despite the moving party's initial burden, the non-moving party may not passively rely on its pleadings to survive summary judgment, but rather must "designate specific facts showing that there is a genuine issue for trial" through "affidavits, . . . depositions, answers to interrogatories, and admissions on file."  *Celotex*, 477 U.S. at 324 (quotations omitted); *see also D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) ("[T]he non-moving party may not

rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

Although the non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment," *Celotex*, 477 U.S. at 324, this statement is not without exception. Even if otherwise inadmissible affidavits and other out-of-court declarations can be considered on summary judgment as the basis for testimony that would be admissible at trial, these declarations cannot contain hearsay statements that would still be inadmissible at trial if the affiants or declarants were to testify to them. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that an affidavit representing that the affiant is "competent to testify to the matters [based on personal knowledge] asserted in the affidavit" may be "submitted in support of or in opposition to the summary judgment motion," but that any "hearsay assertion that would not be admissible at trial if testified to by the affiant" may not be considered with respect to such motion); *see also Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) (holding that "[h]earsay testimony . . . that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56] affidavit" on summary judgment (first and second modifications in original) (quoting 6 Moore's Federal Practice ¶ 56.22[1] (2d ed. 1985))); *accord* Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

### B. Abandoned Claims: Design Defect, Manufacturing Defect, Failure to Warn, Negligence, and Breach of Implied Warranty

This Court begins by considering Plaintiffs' design defect, manufacturing defect, failure to warn, negligence, and breach of implied warranty claims.

Plaintiffs, in their opposition brief, spend no time addressing these five claims (Dkt. No. 29 ("Pls. Br.")), to which Defendants devoted at least 60% of the arguments in their initial brief (Dkt. 25 ("Defs. Br."), at 8-19). Indeed, the argument section for Plaintiffs' opposition brief only contains headings for their "Breach of Express Warranty" and "False Advertising" claims and contends that these two claims should survive summary judgment. (Pls. Br., at 5, 7, 18, 25.)

According to Defendants, Plaintiffs have abandoned all but their breach of express warranty and false advertising claims. (Dkt. No. 26 ("Defs. Reply"), at 2.) This Court agrees that Plaintiffs' failure to acknowledge, let alone address, the remaining five claims in opposing the Motion signals the abandonment of these claims.

Many courts in this District have similarly held. *See Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) (Bianco, J.) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone."); *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (Glasser, J.) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *see also Struthers v. City of N.Y.*, No. 12-CV-242, 2013 WL 2390721, at *18 (E.D.N.Y. May 31, 2013) (Gleeson, J.) ("I deem [the plaintiff's] claim against the City abandoned. [The plaintiff] fails to address defendants' argument for summary judgment on this claim in his opposition brief."); *Robinson v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-834, 2012 WL 1980410, at *6 (E.D.N.Y. May 31, 2012) (Feuerstein, J.) ("[T]he Court considers this claim abandoned because plaintiff has failed to address it in her opposition brief."); *Santiago v. City of N.Y.*, No. 05-CV-3668, 2009 WL 935720, at *11 n.19 (E.D.N.Y. Mar. 31, 2009) (Mauskopf, J.) ("[P]laintiff does not argue any

claim under the First Amendment in her [summary judgment] opposition. To the extent plaintiff did intend to pursue such a claim, it is hereby deemed abandoned and so dismissed."); *Williams v. British Airways, PLC*, Nos. 04-CV-0471, 06-CV-5085, 2007 WL 2907426, at *13 (E.D.N.Y. Sept. 27, 2007) (Sifton, J.) ("Plaintiff does not discuss or argue his retaliation claim in his opposing brief. . . . On this basis alone, the court could grant summary judgment on plaintiff's relation claims under Title VII and Section 1981."); *DeVito v. Barrant*, No. 03-CV-1927, 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (Irizarry, J.) ("The court deems plaintiff's negligent hiring and retention claims abandoned by virtue of his failure to address them in his memorandum responding to defendants' summary judgment motion.").[8]

Accordingly, the Motion is GRANTED as to Plaintiffs' design defect, manufacturing defect, failure to warn, negligence, and breach of implied warranty claims.

### C.  Surviving Claims:  Breach of Express Warranty and False Advertising

This Court turns to Plaintiffs' surviving claims under New York law:  breach of express warranty and false advertising.

New York breach of express warranty claims require (i) a *material statement* amounting to a warranty; (ii) the buyer's *reliance* on this warranty as a basis for the contract with his immediate seller; (iii) the *breach* of this warranty; and (iv) injury to the buyer *caused* by the breach.  *CBS Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 502-504 (1990); *see also Promuto v.*

---

[8]     Abandonment, arising from the non-moving party's failure to address certain claims in an opposition to a summary judgment motion, is distinguishable from that party's failure to submit such an opposition, where this Court must nonetheless determine whether summary judgment is appropriate.  *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (Sotomayor, J.) ("[I]t is clear that even when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.").

*Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (same); *accord* N.Y. U.C.C. § 2-313(1)(a) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.").

In spite of the fact that the buyer might not have contracted with the manufacturer, the buyer may still bring a claim against the manufacturer based on the manufacturer's advertisements, upon which the buyer relied when contracting with his immediate seller. 28 N.Y. Prac., Contract Law § 19:4; *see Randy Knitwear, Inc. v. Am. Cyanamid Co.*, 11 N.Y.2d 5, 12 (1962) (rejecting "manufacturer's denial of liability [for breach of express warranty] on the sole ground of the absence of technical privity," in light of the fact that "the significant warranty, the one which effectively induces the purchase, is frequently that given by the manufacturer through mass advertising . . . to consumers with whom he has no direct contractual relationship").

The elements for New York false advertising claims are similar: (i) a *material statement* (ii) in *consumer-directed* advertisements, (iii) upon which the buyer actually *relies*, where this statement (iv) turns out to be *false or misleading* and (v) *causes* the buyer's injury. *See Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ("Unlike a private action brought under [New York General Business Law] § 350 [for false advertising], a private action brought under § 349 [for deceptive practices] does not require proof of actual reliance."); *Maurizio v. Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000) (per curiam) (holding that, for *prima facie* New York false advertising claims, the statements must be consumer-directed, material, misleading, and the cause of the plaintiff's injury); *Small v. Lorillard Tobacco Co., Inc.*, 679 N.Y.S.2d 593, 599 (1st Dep't 1998) ("[I]ndividualized proof of reliance is essential to the causes of action for

false advertising under GBL § 350 and for common-law fraud, a circumstance that further supports denial of [class] certification."), *aff'd*, 94 N.Y.2d 43 (1999).

Since Plaintiffs' breach of express warranty claim arises from the same Advertisement and Related Statements that underlie their false advertising claim, and these claims involve substantially similar elements (*e.g.*, materiality, reliance, breach/falsity,[9] causation), this Court considers them together. *See, e.g.*, *Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 322 (E.D.N.Y. 2001) (Spatt, J.) (jointly considering whether "Allstate's use of the slogan, 'You're in good hands with Allstate,' constituted false advertising *and* created a warranty which Allstate breached" (emphasis added)).

Unless Defendants can demonstrate that triable issues do not exist to establish an element of each claim in the eyes of the jury, they are not entitled to summary judgment dismissing these claims. Inferences to be drawn from the facts must be "viewed in the light most favorable to" Plaintiffs. *Adickes*, 398 U.S. at 157-59.

1.  Materiality Element

Judge Learned Hand once wrote about commercial puffery being a non-actionable "basis of an action for deceit":

> There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it.

---

[9]     Proof of "breach" for express warranty claims and "falsity" for false advertising claims are essentially the same. *See Util. Metal Research, Inc. v. Generac Power Sys., Inc.*, No. 02-CV-6205, 2004 WL 2613993, at *5 (E.D.N.Y. Nov. 18, 2004) (Block, J.) (equating element of "breach" with evidence that "the warranty was *false or misleading when made*" (emphasis added)), *vacated on other grounds*, 179 F. App'x 795 (2d Cir. 2006); *In re Vivendi Universal, S.A. Sec. Litig.*, Nos. 02 Civ. 5571, 03 Civ. 2175, 2004 WL 876050, at *10 (S.D.N.Y. Apr. 22, 2004) (same).

*Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918). Defendants argue that Louisiana-Pacific's Advertisement and the Home Depot sales associate's Related Statements were mere puffery, which no "reasonable jury" could find were "material" for purposes of Plaintiffs' claims against them. (Defs. Br., at 17-18; Defs. Reply, at 5-7, 9.) This Court disagrees.

As the Second Circuit admits, it has given scant guidance on identifying puffery in similar kinds of commercial cases. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) ("This Court has had little occasion to explore the concept of puffery in the false advertising context."). The patchwork of district court decisions in such cases discuss, but do not create, a workable test for puffery. This Court, however, discerns several factors on which these decisions rely: (i) vagueness; (ii) subjectivity; and (iii) inability to influence the buyers' expectations.

The "vagueness" factor applies when the disputed statements fail to describe a specific characteristic of the product on which the claims are based. *See Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993) ("Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product."); *see also Gillette Co. v. Wilkinson Sword, Inc.*, No. 89 Civ. 3586, 1991 U.S. Dist. LEXIS 21006, at *53 (S.D.N.Y. Jan. 9, 1991) ("Claims . . . that misrepresent specific characteristics of a product . . . are not puffing.").

General descriptions about the product—*e.g.*, high-speed internet service as the "fastest, easiest way to get online"; a truck as the "most dependable, long-lasting"; or an insurance policy as providing that its policyholders are "in Good Hands[TM]"—can constitute puffery. *See Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 643-44 (S.D.N.Y. 2011); *Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *7 (S.D.N.Y. May 22, 1996); *Loubier v. Allstate*

*Ins. Co.*, No. 3:09cv261, 2010 WL 1279082, at *5 (D. Conn. Mar. 30, 2010). By contrast, the Advertisement and Related Statements in this action are far more specific, describing key characteristics of LP SmartSide: its wood-like working quality and ability to take nails.

The "subjectivity" factor applies when the disputed statements may not be measured on an objective basis, such as by reference to clinical studies or comparison with the product's competitors. *See Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) ("Subjective claims about products, which cannot be proven either true or false, are not actionable [for false advertising claims]." (quotations omitted)); *Castrol*, 987 F.2d at 946 (holding that a statement was not mere puffery, because it was also "measurable by comparative research" and, "by implication, compare[d] [Pennzoil's] effectiveness against engine wear to that of its competitors"); *see also Gillette*, 1991 U.S. Dist. LEXIS 21006, at *53 ("It is generally accepted that puffing in advertising is a claim that is not capable of measurement[.]" (quotations omitted)).

Examples of puffery that satisfy this second factor have included statements that a stereo system reflects the "most life-like reproduction of orchestral and vocal sounds" or that a chain of hotels maintains "standards proud enough to bear [the founder's] name."[10] *See Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310-11 & n.11 (2d Cir. 1972); *Hilton Int'l Co., Inc. v. Hilton Hotels Corp.*, 888 F. Supp. 520, 538 (S.D.N.Y. 1995). In this action though, the Advertisement and Related Statements are quantifiable, in that they equate LP SmartSide with

---

[10]   If anything, the statement on Louisiana-Pacific's website that "LP SmartSide products also deliver the beautiful, authentic look of real wood for unbeatable curb appeal" (Defs. Ex. G) represents the sort of puffery that satisfies the second factor. One cannot objectively measure whether LP SmartSide's wood-like appearance is "beautiful," "authentic," or bound to provide "unbeatable curb appeal."

"traditional wood" siding products. These statements specifically measure LP SmartSide's ability to take nails based on this benchmark.[11]

The "inability to influence" factor applies when, among other things, the disputed statements are made by all of the product's competitors, or these statements cannot mean everything that they suggest. *See Vulcan*, 248 F. at 856 (observing that certain statements constituting puffery are "designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth"); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107 (10th Cir. 2009) ("One reason such [puffery] statements are not to be relied on is that they could not possibly mean everything that might be implied."); *cf. ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (holding, albeit in the securities context, that a bank's statements are puffery, where "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements").

For instance, a statement that a sports beverage will "Upgrade your game" is plainly an exaggeration, because no buyer truly believes that consuming this beverage "result[s] in improved athletic abilities." *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 529-30 (S.D.N.Y. 2009). Similarly, a statement that "you can grow thick, beautiful grass ANYWHERE" with a specific type of grass seed is "so exaggerated as to preclude reliance by consumers." *In re Scotts EZ Seed Litig.*, No. 12 Civ. 4727, 2013 WL 2303727, at *7 n.3

---

[11] Defendants reference the fact that the Advertisement employs the subjective term "ease," but fail to reference the fact that it also compares LP SmartSide with "traditional wood" siding products. (Defs. Br., at 17-18; Defs. Reply, at 5-6, 9.) Such selective references violate the rule that one should "consider the advertisement in its entirety and not . . . engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963).

(S.D.N.Y. May 22, 2013) (quotations omitted). Likewise, "consumers know that vehicles that are 'rock-solid' will be dented by an impact that would not dent a rock. . . . A fiberglass roof may be 'strong' enough to withstand a hard blow, a falling tree branch, or the weight of an elephant, without being guaranteed to be indestructible." *Jordan v. Paccar, Inc.*, 37 F.3d 1181, 1185 (6th Cir. 1994). *See also Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676, 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) (Spatt, J.) (finding that a statement concerning a baby formula manufacturer's aim to "comply[] with all applicable laws and regulations"—which, taken literally, would entail every single law in the hundreds of "countries where it operates"— embodies the sort of exaggeration that no buyers could take seriously).

Here, however, the Advertisement and Related Statements can reasonably influence the buyers and shape their expectations. By representing that LP SmartSide acts like "traditional wood" siding products, these statements are not so overblown that they imply more than the buyers ought to anticipate from a siding product. Nor should the buyers expect to hear these statements from the manufacturers of other siding products that do not act like "traditional wood" siding products but have other distinguishing characteristics.

Defendants have failed to demonstrate that the Advertisement and Related Statements constitute puffery as a matter of law. Accordingly, the materiality element for Plaintiffs' claims still presents factual issues for trial.

### 2. Reliance Element

#### i. Claims Against Louisiana-Pacific

Defendants argue that, as Avola did not see the Advertisement before buying LP SmartSide, no "reasonable jury" could find reliance for Plaintiffs' claims against Louisiana-Pacific. (Defs. Br., at 15-17; Defs. Reply, at 6, 8.) This Court disagrees: the jury *could* find that

Avola relied on the Advertisement, as recited by the Home Depot sales associate in his Related Statements at the time of Avola's purchase.

The threshold issue is whether to consider Avola's testimony from his affidavit and deposition, as evidence that the Home Depot sales associate actually made the Related Statements upon which Avola allegedly relied. As discussed *supra* at Section III.A, this Court's consideration of out-of-court declarations on summary judgment cannot include inadmissible hearsay contained therein. According to Defendants, Avola's testimony about what the sales associate said amounts to inadmissible hearsay. (Defs. Reply, at 7-8; Defs. Reply 56.1 ¶¶ 3-4); *see supra* note 5.

The fact that Avola testifies to the making, but not to the truth, of the Related Statements by the Home Depot sales associate renders it non-hearsay. *See* Fed. R. Evid. 801 Advisory Committee Notes to 1972 Proposed Rules ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); 2 McCormick on Evidence § 249 (7th ed. 2013) (noting that "evidence of the utterance by the defendant of words relied on as constituting a . . . deceit" is not hearsay "offered to prove the facts asserted" by the defendant); *accord Jefferson v. Chase Home Fin.*, No. C 06-6510, 2008 WL 1883484, at *2 n.1 (N.D. Cal. Apr. 29, 2008) (overruling objections to "those portions of Plaintiff's Declaration describing statements by Chase's customer service representatives" as hearsay, because such statements were not being offered for their truth but rather as evidence of representations upon which the plaintiff relied); *Tatum v. Cordis Corp.*, 758 F. Supp. 457, 463 (M.D. Tenn. 1991) (only refusing to consider testimony in the plaintiff's affidavit concerning an "unidentified" person's statements regarding the warranty on his pacemaker, where the plaintiff himself was deceased and unable to directly testify to these

statements).  Accordingly, this Court may take into account such testimony in adjudicating the Motion.

Avola's testimony must sufficiently show that the Related Statements recited Louisiana-Pacific's Advertisement, such that Avola relied on the Advertisement for the claims against Louisiana-Pacific.  In *In re Scotts*, the district court held that the statements on the grass seed manufacturer's labeling, *as well as* in-store advertising displays by Home Depot and Lowe's parroting these statements, supported the reliance element for the breach of express warranty claim against the manufacturer.  2013 WL 2303727, at *1, 7.  This Court finds that this holding applies with equal force to the situation where, as here, the sellers *orally* repeated the manufacturer's statements, as opposed to repeating these statements on their in-store advertising displays.[12]

Much in the same way, the district court, in *Westport Marina, Inc. v. Boulay*, 783 F. Supp. 2d 344 (E.D.N.Y. 2010) (Hurley, J.), recognized that the plaintiffs might have relied on the statements purportedly made by the inventor of a particular chemical product and placed by the seller on its labeling for this product, for purposes of the plaintiffs' breach of express

---

[12]     While neither party cited *Flame Cut Steel Prods. Co., Inc. v. Performance Foams Coatings, Inc.*, 46 F. Supp. 2d 222 (E.D.N.Y. 1999) (Trager, J.), the district court in that case addressed a similar issue.  In *Flame Cut Steel*, a company that purchased the coating product in repairing the plaintiff's roof described the manufacturer's warranty for this product as a "ten year no leak warranty."  *Id.* at 227.  This description was ambiguous and arguably referenced a broader warranty than the one applicable to the plaintiff.  *Id.*  Accordingly, the court considered whether the company had the apparent authority to extend this broader warranty through its description on behalf of the manufacturer.  *Id.* at 229-30.  In finding that the company did not have this authority, the court stated that "[a] reasonable customer does not normally infer from the receipt of a manufacturer's warranty from a dealer that the manufacturer is responsible for the dealer's oral representations *describing* the manufacturer's warranty."  *Id.* at 230 (emphasis added).  This Court agrees in principle with this statement, but concludes that *Flame Cut Steel* is distinguishable:  unlike *Flame Cut Steel*, this action involves the recitation, rather than the mere description, of the Advertisement, such that Avola's reliance on the statement being recited is at issue.

warranty, fraud, and misrepresentation claims against the inventor. *Id.* at 346-47, 354. The court in that case concluded, however, that, even if the labeling under which the seller sold this product incorporated the inventor's statements, there was no evidence that the plaintiffs "ever read or even saw" the labeling prior to purchase. *Id.* at 355. Had the plaintiffs read or seen the seller's labeling, they could have claimed reliance on the inventor's statements cited therein, in support of their claims against the inventor.

Similarly, in *Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*, 858 N.Y.S.2d 405 (3d Dep't 2008), the New York Appellate Division assessed the breach of express warranty claim against the manufacturer of engines for the plaintiff's yacht, where the engine manufacturer's statements were supposedly quoted by the yacht manufacturer in its brochure. *Id.* at 407. The court declined to set aside the jury's finding for the engine manufacturer, solely because "the jury may have rationally concluded that the language in [the yacht manufacturer's] brochure constituted statements made by [the yacht manufacturer], rather than [the engine manufacturer]." *Id.* Thus, one can infer from that case that the jury could have properly found the engine manufacturer liable, had it concluded that the yacht manufacturer simply relayed the engine manufacturer's statements.

Here, Plaintiffs have put forth enough evidence, in the form of Avola's testimony, to suggest that the Home Depot sales associate recited, and thereby induced, Avola's reliance on the Advertisement. Plaintiffs' claims against Louisiana-Pacific should therefore survive summary judgment. A "reasonable jury" might find that *at least* two of the Related Statements—that LP SmartSide "nails just like wood" and "works as easy as traditional wood siding"—parroted the Advertisement stating that "LP SmartSide products work and cut just like traditional wood, taking nails and screws with ease." The fact that the jury might also make the

opposite finding merely indicates that the reliance element raises triable issues that this Court should not resolve on summary judgment.

ii. Claims Against Home Depot

Defendants argue that Plaintiffs "cannot maintain [their] claim for a breach of express warranty against Home Depot," on the basis of Avola's alleged reliance on the Home Depot sales associate's Related Statements. (Defs. Br., at 16.) Defendants do not specifically address Plaintiffs' false advertising claim against Home Depot (*see* Defs. Br., at 16-19; Defs. Reply, at 8-9),[13] but the above argument should apply to that claim as well. This Court agrees that no jury could reasonably find that Avola relied on any warranties or advertising by Home Depot.

The evidence presents two possible theories for finding such reliance. The first theory depends on the finding that the Home Depot sales associate recited statements in the Advertisement, *e.g.*, that LP SmartSide "nails just like wood" and "works as easy as traditional wood siding." This finding, however, would only support reliance for the claims against Louisiana-Pacific and not Home Depot. In *In re Scotts*, the district court similarly held that the plaintiffs were able to bring their breach of express warranty claim against the grass seed manufacturer, not Home Depot and Lowe's. The sellers had simply parroted the manufacturer's statements on their in-store advertising displays:

---

[13] Presumably, the reason that Defendants do not acknowledge a false advertising claim against Home Depot is that they started by assuming that the Related Statements did not recite the Advertisement. Based on that assumption, the Related Statements, made in person by the Home Depot sales associate to Avola, were merely the basis for a "[p]rivate contract dispute[], unique to the parties," not a dispute involving conduct with a "broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995); *see Maurizio*, 230 F.3d at 522 (applying *Oswego* to New York false advertising claim). If the Related Statements were not "consumer-directed," they could not constitute the basis for this claim against Home Depot.

> Plaintiffs have failed to allege sufficiently that Home Depot or Lowe's independently made the same promises when selling EZ Seed to plaintiffs—as opposed to merely passively displaying the promises made by Scotts on EZ Seed's labeling—or that specific statements made by Home Depot or Lowe's were otherwise 'part of the basis' of plaintiffs' bargain.

2013 WL 2303727, at *7.[14] As in that case, assuming the Home Depot sales associate "passively" recited Louisiana-Pacific's Advertisement in his Related Statements to Avola, without separately promising more, the sole "basis of [Avola's] bargain" would be the Advertisement. *Id.* (quotation omitted). Plaintiffs would have the right to sue Louisiana-Pacific, but not Home Depot, for breach of express warranty and false advertising.

The second theory depends on the finding that the Home Depot sales associate not only recited the Advertisement, but separately represented that LP SmartSide can be installed the same way as T1-11 Siding, a siding product with which Avola was familiar. Even assuming that Avola relied on the sales associate's independent representation regarding T1-11 Siding, as Defendants point out (Defs. Br., at 16), Plaintiffs cannot show that Avola was acting as Home Depot's agent for this purpose. *See, e.g.*, *Westport Marina*, 783 F. Supp. 2d at 353-54 (dismissing on summary judgment breach of express warranty, fraud, and misrepresentation claims, in light of the "mere scintilla of evidence on the issue of agency, at least insofar as it relates to any oral representations made to Plaintiffs by [an individual]" allegedly acting on

---

[14] The court in *In re Scotts* allowed the plaintiffs to assert their false advertising claim against Home Depot, but only because the reliance element "need not be *pleaded* to state a claim" under New York law. 2013 WL 2303727, at *10-11 & n.5 (emphasis added) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012) (motion to dismiss false advertising claim)). Even though the plaintiffs' false advertising claim against Home Depot survived a motion to dismiss, it would not have survived a hypothetical summary judgment motion, absent sufficient proof of their reliance, for the same reason that the breach of express warranty claim failed. It is well-established, by the Second Circuit and the New York Court of Appeals, that reliance remains an essential element of false advertising claims under New York law. *Pelman*, 396 F.3d at 511; *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 53-55 (1999).

behalf of the defendant (quotations omitted)). In short, for reasons relating to reliance, Plaintiffs still would not be able to assert their claims against Home Depot.

Under New York law, employees act as agents when they have (i) *actual authority* to do something, because their employers' "words or conduct" expressly or implicitly manifest to them consent to this authority; or (ii) *apparent authority* to do something, because their employers' words or conduct cause third parties "to believe that [their employers] consent[]" to this authority. *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68-69 (2d Cir. 2003) (quoting *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996)); *see also Carte Blanche (Sing.) PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 919-21 (S.D.N.Y. 1991) (Leisure, J.) (same); *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980) (same); *Wen Kroy Realty Co., Inc. v. Pub. Nat'l Bank & Trust Co. of N.Y.*, 260 N.Y. 84, 91 (1932) ("Though actual authority is the result of the principal's consent manifested to the agent, apparent authority is the result of consent manifested to the third party.").

Plaintiffs in this action have failed to adduce any evidence to support the finding that the Home Depot sales associate acted under Home Depot's actual or apparent authority, in making the Related Statements. On the contrary, the evidence shows that Home Depot never suggested, much less stated, to its employees that they had actual authority to make statements promising or promoting the performance of the products sold. Home Depot (i) hired its employees without requiring any experience in home improvement or construction, and assigned them to departments for which they had no prior experience; (ii) only offered them basic classes on the products in their department, but did not require that they read about or train in the use of these products; and (iii) expected them to help out throughout the entire Store, not just their

department. No employee would have thought that Home Depot vested them with actual authority to make actionable representations about any products.

Nor should Avola, as an employee himself, have believed that Home Depot vested another employee in his position, like the sales associate who sold him LP SmartSide, with apparent authority to do the same.[15] *Cf. Halpert v. Manhattan Apartments, Inc.*, 580 F.3d 86, 88 (2d Cir. 2009) (per curiam) (holding that whether the company vested apparent authority in its agent must be viewed "in the eyes of" the particular plaintiff). Avola admitted that Home Depot assigned him to work in a department for which he had no direct experience and only enough indirect knowledge to assist the customers. In light of what he knew as an employee, Avola had no basis for believing that Home Depot authorized the sales associate's Related Statements about LP SmartSide. Even assuming that the sales associate, "by his own acts[,] imbue[d] himself with apparent authority" when Avola bought LP SmartSide, such conduct cannot counteract the absence of any conduct by Home Depot, which would have caused Avola to believe that the sales associate had this authority. *Hallock v. State*, 64 N.Y.2d 224, 231 (1984); *see also Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989) ("Second Circuit case law supports the view that apparent authority is created only by the representations of the principal to the third party, and explicitly rejects the notion that an agent can create apparent authority by his own actions or representations." (collecting cases)).

Regardless of whether the jury finds that the Home Depot sales associate recited the Advertisement in his Related Statements, it cannot ultimately find that Avola relied on these

_____

[15] This Court is aware that "[t]he existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff*, 98 F.3d at 708. No such question, however, attends the *absence* of this authority, which is all that the evidence suggests. *See, e.g.*, *Flame Cut Steel*, 46 F. Supp. 2d at 229-30 (collecting cases).

statements for the breach of express warranty and false advertising claims against Home Depot. Thus, there are no triable issues with respect to the reliance element for either claim.

### 3. Breach/Falsity and Causation Elements

With respect to the claims against both Louisiana-Pacific *and* Home Depot, Defendants argue that Plaintiffs are required to submit expert testimony to support the conclusion that LP SmartSide (i) did not comport with the Advertisement and Related Statements, and thereby (ii) caused Avola's accident. (Defs. Br., at 10-11, 18-19; Defs. Reply, at 3-4, 9.) This Court disagrees.

As an initial matter, the cases cited by Defendants (Defs. Br., at 10-11; Defs. Reply, at 3-4) are inapposite. None of these cases directly support Defendants' claim that the failure to furnish expert testimony is fatal to Plaintiffs' breach of express warranty and false advertising claims.[16] Defendants ignore that, in one of the very cases that they cite, the New York Court of Appeals, albeit in addressing a design defect claim, actually refused to require expert testimony, and reasoned that a jury may find causation "from its consideration of the characteristics of the

---

[16]    *See Cuntan v. Hitachi Koki USA, Ltd.*, No. 06-CV-3898, 2009 WL 3334364, at *5-6, 8 (E.D.N.Y. Oct. 15, 2009) (Mauskopf, J., adopting Report-Recommendation of Pollak, M.J.) (only considering claims for design and manufacturing defects, failure to warn, and negligence, and recognizing that a *design defect* claim "generally require[s]" expert testimony to prove the "feasibility and efficacy of alternative designs," but that such a claim can still proceed "[w]here a plaintiff fails to provide expert testimony"); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 551, 570 (S.D.N.Y. 2005) (concluding, among other things, that a breach of *implied* warranty claim requires expert testimony to establish the causation element, *only* where "there are scientific and technical issues involved"); *Gilks v. Olay Co., Inc.*, 30 F. Supp. 2d 438, 439, 443-44 (S.D.N.Y. 1998) (dismissing claims sounding in "tort, breach of warranty, and strict liability," where the plaintiff's only "evidence of causation" was her "[m]ere use of the product and subsequent injury," and citing the absence of expert testimony, among other things, without expressly requiring it); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106, 110 (1983) (noting that the plaintiff had "abandoned his claim under the warranty cause of action," and that, with respect to his design defect claim, "[e]xpert testimony with reference to proximate causation is *not* always required" (emphasis added)).

[product] and plaintiff's description of how the accident happened." *Voss*, 59 N.Y.2d at 110-11; *accord Blockhead, Inc. v. Plastic Forming Co., Inc.*, 402 F. Supp. 1017, 1027 (D. Conn. 1975) (applying Connecticut law) (merely ruling, with respect to a breach of express warranty claim, that expert testimony "*may* be required" to determine the breach element (emphasis added)); *Diaz v. Audi of Am., Inc.*, 873 N.Y.S.2d 308, 312 (2d Dep't 2008) (citing the fact, in awarding attorney's fees, that the two-day trial involving a breach of warranty claim "did not raise any novel or complex issues, or even ones that required expert proof"); *cf. Walters v. Howmedica Osteonics Corp.*, 676 F. Supp. 2d 44, 54-56 (D. Conn. 2009) (applying Connecticut law) (stating as dicta, with respect to negligence and breach of implied warranty claims, that "even in a case involving physical injuries, expert testimony *may not be necessary* to establish causation if the plaintiff's evidence creates a probability so strong that a jury can form a reasonable belief without the aid of any expert opinion" (emphasis added) (quotations omitted)).

Relying on the "characteristics" of LP SmartSide and Avola's "description of how the accident happened," as well as certain other evidence, a jury may reasonably conclude, without the aid of experts, that the Advertisement and Related Statements, by virtue of their breach or falsity, were the cause of Avola's accident. *Voss*, 59 N.Y.2d at 111. The Advertisement and Related Statements represented that LP SmartSide had the same working quality and ability to take nails as "traditional wood" siding products. The evidence suggests that LP SmartSide might not have performed accordingly: arguably, it did not work and take nails like *any* wood used in construction, much less "traditional wood" siding products,[17] and, uncharacteristic of wood used in construction, a nail ricocheted into Avola's eye.

---

[17]    One of Defendants' related objections is that, without expert testimony, Plaintiffs are unable to define what "traditional wood" siding products are, in order to compare the

Knowledgeable about different types of wood, after working in the carpentry industry for over three decades, Avola attested that only "soft woods" are used in construction. This type of wood is easy to nail into: one can hammer the nail once to get it to hold, before hammering in the rest of it; and drilling is never necessary. For the shed, Avola had previously used without incident T1-11 Siding, a product belonging to the same category of actual "wood" siding products as "traditional wood" siding products. By contrast, for the extension on the shed, Avola used LP SmartSide, for which he had to hammer not once, but two or three times to get the nails to hold. After the accident, Avola was only able to finish nailing in the panels of LP SmartSide with a drill. This evidence, even without expert testimony, establishes enough issues as to the breach/falsity element for Plaintiffs' claims to survive summary judgment.

Avola also attested that, at most, the nail falls but never flies out of the "soft woods" used in construction. From the beginning, however, Avola was finding that, in certain spots, the nails either fell off or would not go into the panels of LP SmartSide. When the accident finally

---

characteristics of these products with the characteristics of LP SmartSide. (Defs. Br., at 18-19; Defs. Reply, at 4, 9; Defs. Reply 56.1 ¶¶ 7-8, 11, 14.) This objection is unavailing. The fact that the evidence suggests that LP SmartSide did not perform like *any* wood used in construction is sufficient to raise triable issues regarding the breach/falsity element, without a specific definition for "traditional wood" siding products.

At any rate, Plaintiffs have adduced enough evidence as to the definition of "traditional wood" siding products to assess at trial the breach/falsity element: (i) such products are arguably a subset of actual "wood" siding products, which include T1-11 Siding, and (ii) LP SmartSide did not perform like T1-11 Siding previously used by Avola, nor any "traditional wood" siding product.

In refusing to require expert testimony for the purpose of defining "traditional wood" siding products, this Court points out that the meaning of phrases in advertising should not rely too much on the technical meanings that experts might provide; instead, "[t]he important criterion is the net impression which the advertisement is likely to make upon the general populace," *not* "the wise and the worldly" universe of experts. *Charles of the Ritz Distribs. Corp. v. FTC*, 143 F.2d 676, 679-80 (2d Cir. 1944) (reviewing the FTC's cease and desist order regarding false advertising).

occurred, the nail flew into Avola's eye with force that felt to him like a bullet. The fact that Avola had hammered about 100 nails into seven panels up to this point tends to rebut the possibility that the accident resulted from issues in his technique, such as hammering at the wrong angle, or the size of the nail that he used. As such, absent expert testimony, there still remain factual issues for trial regarding the causation element for Plaintiffs' claims.

For all of the above reasons, the Motion is GRANTED as to Plaintiffs' breach of express warranty and false advertising claims against Home Depot, given the absence of any issues regarding the reliance element for these claims. The Motion, however, is DENIED as to the same claims against Louisiana-Pacific.

IV.  Conclusion

This Court therefore GRANTS Defendants' Motion, dismissing with prejudice (i) the design defect, manufacturing defect, failure to warn, negligence, and breach of implied warranty claims against Louisiana-Pacific and (ii) all claims against Home Depot; but DENIES the Motion with respect to the rest of the claims. Accordingly, the sole remaining claims are the breach of express warranty, false advertising, and loss of consortium claims[18] against Louisiana-Pacific. The Clerk of the Court is directed to enter judgment terminating this action against Home Depot,[19] which shall bear its own costs and fees.

_____

[18]  Defendants' sole argument regarding the dismissal of Plaintiffs' loss of consortium claims is that they are "derivative of the underlying claims." (Defs. Br., at 19); *see Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) (dismissing the wife's derivative loss of consortium claims, "since none of [the husband's claims for toxic exposure and breach of warranty] survive"). Having dismissed the other claims against Home Depot, but not the breach of express warranty and false advertising claims against Louisiana-Pacific, this Court maintains the loss of consortium claims based on the remaining claims against Louisiana-Pacific.

[19]  The Clerk of the Court is also directed to amend the caption by removing "Home Depot Store #1202" as one of the Defendants in this action, because it is a "non-existent entity." (Dkt. No. 1-2.)

SO ORDERED:

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: August 28, 2013
       Brooklyn, New York